UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

MARTHA CARROLL, GAIL TUTEN,
MELINDA WEBB, and RANDY BOUTWELL,

     Plaintiffs,

v.                                                                        No. 1:17-CV-1127-STA-egb

TDS TELECOMMUNICATIONS                        JURY TRIAL DEMANDED
CORPORATION, TDS TELECOM                        CLASS ACTION
SERVICE, LLC f/k/a TDS TELECOM
SERVICE CORPORATION, and
TENNESSEE TELEPHONE COMPANY,

     Defendants.

---

THIRD AMENDED COMPLAINT
FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF
AND FIRST ASSERTING CLASS-ACTION CLAIMS

---

Plaintiffs, Martha Carroll, Gail Tuten, Melinda Webb, and Randy Boutwell, on behalf of

themselves and others similarly situated, submit the following Third Amended Complaint, the

second asserting class-action claims, against Defendants, TDS Telecommunications Corporation,

TDS Telecom Service, LLC f/k/a TDS Telecom Service Corporation, and Tennessee Telephone

Company, (collectively, "TDS" or "TDS Defendants"), and state in support as follows:

I.   Nature of the Complaint

1.     TDS is an internet provider that has made false, misleading, and fraudulent

representations concerning its purportedly "High-Speed Internet Plans" advertised and sold to

customers in rural Tennessee. TDS has advertised several "High-Speed Internet Plans" that

purport to have a certain "range" of "high speed" internet access: the "Mach Internet" with

"Download Range: 18Mbps [Megabits per second] to 25Mbps"; "Turbo Internet" with "Download Range: 8Mbps to 15Mbps"; "Express Internet" with "Download Range: 56Kbps [Kilobits per second] to 5Mbps"; and "Lite Internet" with "Download Range: 56Kbps to 1Mbps." TDS has advertised some of these "High-Speed Internet Plans" as being purportedly "[g]reat for visiting sites like Netflix, YouTube, and Hulu" and "let[ting] you stream Netflix Super HD." Although TDS charges rates commensurate with the advertised high-speed internet services, TDS's customers get nowhere near the ranges promised. Some TDS customers who were promised "Download Range: 8Mbps to 15Mbps" receive as low as 0.02 Mbps or 20 Kbps. TDS has known and admitted to upset customers that the infrastructure simply cannot support the advertised "high speed" ranges. TDS has acknowledged that the infrastructure problem has been present since at least 2013 and that no projects are in place or even planned to address the deficiencies. TDS's "high speed" plans are patently false, misleading, and fraudulent. TDS has failed to provide customers with the advertised ranges for the "High-Speed Internet Plans" while having full knowledge that the infrastructure and other problems could not support such ranges. The actual speeds of TDS's "High-Speed Internet Plans" have failed to comply with any reasonable definition of "high speed" internet, including the definitions propounded by the FCC. The "High-Speed Internet Plans" do not actually allow customers to access certain websites (for example, Netflix, YouTube, and Hulu) promised in some of TDS's advertising. Additionally, TDS received in 2011 a $5,150,691 "Last Mile" grant from the USDA's Rural Utilities Service to bring to rural Tennesseans broadband with a target speed of 20 Mbps, and upon information and belief, have failed to comply with the requirements of the Broadband Initiatives Program Grant. To make matters worse, TDS has charged an "early termination" fee to customers who have cancelled TDS internet service because the internet service actually ranged from horrible to non-existent.

Plaintiffs are residents of Perry County and Decatur County and are current and former customers of TDS's high-speed internet plans. TDS has charged Plaintiffs for internet services it never actually provided and in some cases, charged early termination fees when the internet service was cancelled because of horrible service. Plaintiffs seeks certification of a class of injured TDS customers as well as monetary damages and injunctive relief based on breach of contract, fraud, unjust enrichment, civil conspiracy, and violations of the Wisconsin Deceptive Trade Practices Act, WISC. STAT. § 100.18.

## II. Parties

2. Plaintiff Martha Carroll is an adult Tennessee citizen residing at 134 West Brooklyn Avenue, Linden, Perry County, Tennessee.

3. Plaintiff Gail Tuten is an adult Tennessee citizen residing at 3383 Highway 114 West, Bath Springs, Decatur County, Tennessee.

4. Plaintiff Melinda Webb is an adult Tennessee citizen residing at 56 Lakeview Cove Road, Linden, Perry County, Tennessee.

5. Plaintiff Randy Boutwell is an adult Tennessee citizen residing in Linden, Perry County, Tennessee.

6. Defendant TDS Telecommunications Corporation ("TDS Delaware") is a Delaware corporation with its principal place of business located at 525 Junction Road, Madison, Wisconsin 53717. TDS's registered agent is Corporation Service Company, 8040 Excelsior Drive, Suite 400, Madison, Wisconsin, 53717.

7. Defendant TDS Telecom Service, LLC f/k/a TDS Telecom Service Corporation ("TDS Iowa") is an Iowa limited liability company with a principal place of business located at

525 Junction Road, Madison, Wisconsin 53717. TDS Iowa's registered agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

8.     Defendant Tennessee Telephone Company is a Tennessee company with a principal place of business at 525 Junction Road, Madison, Wisconsin 53717. Tennessee Telephone Company's registered agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

### III.   Jurisdiction and Venue

9.     As asserted by Defendants in their notice of removal (Dkt. Ent. 1 at PageID 4), the Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(c)(1).

10.    This District and Division are the proper venue for this lawsuit under 28 U.S.C. § 1441(a) given that Western District of Tennessee and the Eastern Division embrace the circuit court in which this matter was pending at the time of removal.

### IV.   Background

11.    TDS has offered several "High-Speed Internet Plans" to customers in rural Tennessee.

12.    The "High-Speed Internet Plans" have included, but are not limited to, "Mach Internet," "Turbo Internet," "Express Internet," and "Lite Internet."

13.    For the "High Speed Mach Internet" or "Mach Internet," TDS has advertised the download speed as "Download Range: 18Mbps to 25Mbps" and the upload speed as "Upload Range: 2Mbps to 5Mbps."

14.    For the "High Speed Turbo" or "Turbo Internet" plan, TDS claims the plan provides "high speed," "fast speed," or "Turbo" internet service.

15.    TDS has advertised its "Turbo" internet service as:

Fast speed for typical users with multiple computers or Internet-connected devices.

Get the speed you need to do what you want online. You'll be able to easily handle complex web pages, download large files, and upload larger files. Provides faster upload speed, too.

16. TDS claims that the "Turbo" plan provides a range of "8—15Mbps download speed" as well as "768Kbps upload speed."

17. On a separate advertisement page, TDS expressly states that "Turbo Internet" provides the following: "Download Range: 8Mbps to 15Mbps." TDS states unequivocally that the speeds are a "range," and thereby indicates that 8Mbps is the low end of the range. See http://tdstelecom.com/shop/internet-services/high-speed-internet-plans.html (last visited June 7, 2016).

18. TDS's advertisements have described its "Turbo" plan as: "Faster uploads and downloads"; "Great for visiting sites like Netflix, YouTube, and Hulu"; and "Superior connection lets you stream Netflix Super HD."

19. TDS has also offered "High Speed Express Internet" or "Express Internet" with a download speed advertised as "Download Range: 56Kbps to 5Mbps."

20. TDS has also offered "High Speed Lite Internet" or "Lite Internet" with a download speed advertised as "Download Range: 56Kbps to 1Mbps."

21. TDS has also made these and similar representations through its newspaper advertisements as well as through statements made by TDS customer service representatives over the phone to potential customers.

22. TDS customer service representatives have advised new customers that their "high speed" internet service would support streaming from sites like Netflix, YouTube, and Hulu even though TDS knew it could not support such activity.

23.     Despite TDS's advertisements for "High Speed Internet," TDS's services provided to customers in Perry County and Decatur County, Tennessee, and elsewhere in rural Tennessee have fallen grossly short of the ranges advertised, let alone any reasonable definition of "high speed" internet.

24.     TDS customers have complained of receiving only 0.02 Mbps or 20 Kbps download speed and having no ability to access sites such as Netflix, YouTube, and Hulu, contrary to the promises in TDS's advertisements.

25.     TDS has even admitted to complaining customers that the infrastructure simply cannot support the speeds advertised given certain capacity issues.

26.     TDS has acknowledged to complaining customers that it has been aware of these problems since at least 2013 and that there is currently no project in place to address the problems.

27.     Only after customers complain loudly enough has TDS offered any "solutions" for the lack-of-high-speed problem.

28.     In some cases, TDS has tried to have customers upgrade their plans to purportedly higher speeds, despite knowing the infrastructure problems prevent customers from having higher speeds.

29.     In other cases, after acknowledging the infrastructure problems, TDS has suggested the only "solutions" are (1) ending the internet service without a termination or cancellation fee; (2) subscribing to a different cable or satellite company that provides internet service; or (3) using a data hotspot set up with the customer's digital phone.

30.     TDS has admitted that TDS cannot fix the slow internet speeds through its own services and that TDS has no project planned to address the problems.

31.     Despite this knowledge, TDS has still advertised and charged rural Tennesseans for a "High-Speed" internet service that does not exist.

32.     Additionally, TDS misled then-current customers into believing a solution might be available for TDS's slow or non-existent internet services, thereby causing the frustrated customers to continue their subscriptions even though TDS knew, as least since 2013, that TDS was incapable of providing the services or speed advertised or contracted for.

33.     TDS's actions were malicious, intentional, fraudulent, or reckless.  TDS also acted with an intentional disregard for Plaintiffs' and the Class's rights.

The FCC's Definition of "High Speed" Internet

34.     Section 706 of the Telecommunications Act of 1996 gives the Federal Communications Commission ("FCC") authority to set definitions for the term "advance telecommunications capability" as well as the terms "high speed" and "broadband" in relation to internet services.  47 U.S.C. § 1302.

35.     On August 3, 2000, the FCC first defined "high speed" internet as requiring a download speed of at least 200 Kbps [Kilobits per second].  See FCC's "Second Report," CC Docket No. 98-16, FCC 00-290 at ¶¶ 8, 269 (Aug. 3, 2000) (*see* https://transition.fcc.gov/Bureaus/Common_Carrier/Orders/2000/fcc00290.pdf).

36.     On July 16, 2010, the FCC revisited the definition of "high speed" or "broadband" internet and raised the download speed to 4 Mbps and the upload speed to 1 Mbps.  See FCC's "Sixth Broadband Deployment Report," GN Docket No. 09-137, FCC 10-129 at ¶¶ 11, 30 (July 16, 2010) (*see* https://apps.fcc.gov/edocs_public/attachmatch/FCC-10-129A1.pdf).

37.     On January 29, 2015, the FCC again raised the definition of "high speed" or "broadband" internet to require 25 Mbps download speed and 3 Mbps upload speed.  See FCC's

"2015 Broadband Progress Report and Notice of Inquiry on Immediate Action to Accelerate Deployment," GN Docket No. 14-126, FCC 15-10 at ¶¶ 3, 167, 168 (Jan. 29, 2015) (see https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-10A1.pdf).

38.     The FCC's January 29, 2015, ruling also took specific efforts to define "'high-speed' . . . by examining trends in providers' speed offerings . . . ." *Id.* at ¶ 27.

39.     In the immediately subsequent section analyzing "higher speeds," the FCC reviewed the speed offerings of Comcast and Google Fiber as well as recommendations from Verizon, AT&T, and Time Warner Cable and ultimately finding, "Industry-wide, companies are asserting that a minimum of 25 Mbps downstream is required to take advantage of the services widely offered and used today." *Id.* at 28.

40.     The FCC determined, "The benchmark of 4 Mbps/1 Mbps, which was set in 2010, no longer allows customers to use the broadband services widely marketed and used today (such as HD video), and certainly does not enable more advanced services that are being rolled out (such as 4K TV). Most commenters agree that 4 Mbps/1 Mbps no longer is sufficient." *Id.* at ¶ 46.

41.     The FCC's primary purpose in increasing the definition of "high speed" and "broadband" was to address the "digital divide [that] persists between urban and non-urban parts of the country." *Id.* at ¶ 5.

42.     The FCC's data showed that "Americans living in rural areas and on Tribal lands disproportionately lack access to broadband." *Id.* at ¶ 6.

43.     "More than 53 percent of Americans living in rural areas lack access to fixed 25 Mbps/3 Mbps broadband service as compared to 8 percent of Americans living in urban areas." *Id.* at ¶ 79.

44. The actual speeds of TDS's "High-Speed Internet Plans," which have been as low as 0.02 Mbps or 20 Kbps, have completely failed to satisfy FCC's definitions of "high speed" internet under either the 2010 ruling (4Mbps/1Mbps) or the 2015 ruling (25Mbps/3Mbps).

### USDA and Rural Utilities Service Grant to TDC

45. Under the American Recovery and Reinvestment Act of 2009, the U.S. Department of Agriculture's ("USDA") Rural Utilities Service ("RUS") oversaw the distribution of more than $3.5 billion in federal funds to expand broadband networks in rural communities to close the digital divide between rural and urban communities.

46. The RUS instituted a Broadband Initiatives Program ("BIP") to distribute the federal funds through grants and low interest loans.

47. In 2010, TDS's subsidiary, Defendant Tennessee Telephone Company, applied to RUS for a "Last Mile" grant to bring high-speed broadband service to rural communities in Tennessee, including Perry County and surrounding areas. "Last Mile" projects provide broadband service to households and other end users in contrast to "middle mile" projects that provide necessary backbone services such as interoffice transport, backhaul, internet connectivity, or special access to rural areas.

48. RUS awarded Tennessee Telephone Company a $5,150,691 "Last Mile" grant to bring broadband to Tennessee's rural areas, including Perry County and surrounding areas.

49. The target speed for Tennessee Telephone Company's rural customers was 20 Mbps. Tennessee Telephone Company's plan for accomplishing the target involved multiple improvements, including, but not limited to, upgrading access in the central office to support the extension of the broadband networks to the rural areas.

50.     Upon information and belief, TDS has failed to comply with the requirements of the grant issued by RUS.

51.     TDS's efforts have not improved the internet speeds to anywhere near the targeted 20 Mbps for the named Plaintiffs or the individuals in the proposed class.

### Plaintiff Martha Carroll

52.     Ms. Carroll, a resident of Perry County, signed up for "Turbo Internet" and has paid approximately $120 to $150 per month for TDS's internet and telephone package, a rate commensurate with the cost of a joint package containing high-speed internet service.

53.     When Ms. Carroll and her family signed up for the 5 Mbps plan, the TDS customer service representative advised that their "high speed" internet service would support streaming from sites like Netflix, YouTube, and Hulu, even though TDS knew it could not support such activity.

54.     TDS has not provided Ms. Carroll with the "high speed," "fast speed," or "Turbo" internet as advertised.

55.     Ms. Carroll's actual download speed was as low as 0.02 Mbps or 20 Kbps.

56.     Ms. Carroll has not experienced the advertised "Download Range: 8Mbps to 15Mbps" or an upload speed of 768 Kbps.

57.     Ms. Carroll has been unable to access or enjoy websites such as Netflix, Netflix Super HD, YouTube, or Hulu.

58.     Plaintiff has not received the benefits advertised or contracted by TDS.

59.     TDS had knowledge that its infrastructure for providing internet services to rural Tennessee customers was incapable of providing the "high speed" or "fast speed" internet services that TDS advertised.

60.    TDS had knowledge that its infrastructure for providing internet services to rural customers in Tennessee was incapable of satisfying even the low end of the speed "range[s]," which was 8 Mbps for "Turbo," that were advertised on TDS's website.

61.    TDS had knowledge that its infrastructure and other problems would not allow the proposed upload speeds or provide the benefits of "visiting sites like Netflix, YouTube, and Hulu" or a give customers a "[s]uperior connection [that] lets you stream Netflix Super HD."

62.    In fact, TDS representatives have admitted to "high speed" internet customers that problems with TDS's infrastructure had prevented TDS from providing the promised "high speed" service since at least 2013.

63.    On multiple occasions, Ms. Carroll had TDS service technicians come to her house to try to fix her slow-speed internet problems.

64.    Ms. Carroll and her family continued their TDS subscription as a result of TDS's agents' misleading representations that TDS was trying to and could possibly fix the slow internet service.

65.    Finally, TDS representatives admitted to Ms. Carroll or her family that infrastructure and other problems prevented TDS from ever being able to actually provide the high-speed internet that TDS advertised and for which Ms. Carroll had paid.

66.    Defendants have completely failed to provide Ms. Carroll with high-speed internet services.

<u>Plaintiff Gail Tuten</u>

67.    Ms. Tuten, a resident of Decatur County, has had internet service with TDS since approximately 2005 or 2006 and has had "Turbo Internet" for a significant amount and is still a current customer.

68.     When Ms. Tuten and her family signed up for the 5 Mbps plan, the TDS advised that their "high speed" internet service would support streaming from sites like Netflix, YouTube, and Hulu, even though TDS knew it could not support such activity.

69.     While she has had "Turbo Internet," she has paid a rate commensurate with the expected cost for receiving high-speed internet service.

70.     TDS has not provided Ms. Tuten with the "high speed," "fast speed," or "Turbo" internet as advertised.

71.     Ms. Tuten's actual download speeds normally do not exceed 3 Mbps.

72.     On some occasions, internet service is non-existent.

73.     Ms. Tuten has not experienced the advertised "Download Range: 8Mbps to 15Mbps" or an upload speed of 768 Kbps.

74.     Ms. Tuten has been unable to access or enjoy websites such as Netflix, Netflix Super HD, YouTube, or Hulu.

75.     Plaintiff has not received the benefits advertised or contracted by TDS.

76.     TDS had knowledge that its infrastructure for providing internet services to rural Tennessee customers was incapable of providing the "high speed" or "fast speed" internet services that TDS advertised.

77.     TDS had knowledge that its infrastructure for providing internet services to rural customers in Tennessee was incapable of satisfying even the low end of the speed "range[s]," which was 8 Mbps for "Turbo," that were advertised on TDS's website.

78.     TDS had knowledge that its infrastructure and other problems would not allow the proposed upload speeds or provide the benefits of "visiting sites like Netflix, YouTube, and Hulu" or a give customers a "[s]uperior connection [that] lets you stream Netflix Super HD."

79.     In fact, TDS representatives have admitted to "high speed" internet customers that problems with TDS's infrastructure had prevented TDS from providing the promised "high speed" service since at least 2013.

80.     On multiple occasions, Ms. Tuten had TDS service technicians come to her house to try to fix her slow-speed internet problems.

81.     Ms. Tuten and her family continued their TDS subscription as a result of TDS's agents' misleading representations that TDS was trying to and could possibly fix the slow internet service.

82.     Defendants have completely failed to provide Ms. Tuten with high-speed internet services.

Plaintiff Melinda Webb

83.     Ms. Webb, a resident of Perry County, had internet service with TDS for over ten (10) years until June 2018.

84.     Ms. Webb had signed up for a 5Mbps internet-service plan, or upon information and belief, TDS's "Express Internet."

85.     She has paid a rate commensurate with the expected cost for receiving high-speed internet service.

86.     When Ms. Webb and her family signed up for the 5 Mbps plan, the TDS advised that their "high speed" internet service would support streaming from sites like Netflix, YouTube, and Hulu.

87.     TDS has not provided Ms. Webb with the level of internet service advertised or promised. Specifically, since approximately 2012, Ms. Webb was unable to stream videos as TDS had represented to her.

88.     On many occasions, her internet service is non-existent.

89.     Ms. Webb has not received the benefits advertised or contracted by TDS.

90.     TDS had knowledge that its infrastructure for providing internet services to rural Tennessee customers was incapable of providing the "high speed" or "fast speed" internet services that TDS advertised.

91.     TDS had knowledge that its infrastructure and other problems would not allow the proposed upload speeds or provide the benefits of "surf[ing] without buffering or delays."

92.     Ms. Webb contacted TDS many times about the problems with her internet.

93.     Eventually, TDS representatives admitted to Ms. Webb that problems with TDS's infrastructure have prevented TDS from providing the promised "high speed" service.

94.     Ms. Webb and her family continued their TDS subscription as a result of TDS's agents' misleading representations that TDS was trying to and could possibly fix the slow internet service.

95.     Defendants have completely failed to provide Ms. Webb with high-speed internet services.

Plaintiff Randy Boutwell

96.     Mr. Boutwell, a resident of Perry County, has had internet service with TDS since 2009 or 2010 and is still a current customer.

97.     Mr. Boutwell had signed up for a 5Mbps internet-service plan, or upon information and belief, TDS's "Express Internet."

98.     When Mr. Boutwell and his family signed up for the 5 Mbps plan, the TDS customer service representative advised that their "high speed" internet service would support

streaming from sites like Netflix, YouTube, and Hulu, even though TDS knew it could not support such activity.

99.  He has paid a rate commensurate with the expected cost for receiving high-speed internet service.

100.  TDS has not provided Mr. Boutwell with the level of internet service advertised or promised.

101.  On many occasions, his internet service has been non-existent.

102.  On multiple occasions, Mr. Boutwell had TDS service technicians come to his house to try to fix his internet problems.

103.  Mr. Boutwell and his family continued their TDS subscription as a result of TDS's agents' misleading representations that TDS was trying to and could possibly fix the slow internet service.

104.  Mr. Boutwell has not received the benefits advertised or contracted by TDS.

105.  TDS had knowledge that its infrastructure for providing internet services to rural Tennessee customers was incapable of providing the "high speed" or "fast speed" internet services that TDS advertised.

106.  TDS had knowledge that its infrastructure and other problems would not allow the proposed upload speeds or provide the benefits of "surf[ing] without buffering or delays."

107.  In fact, TDS representatives have admitted to Mr. Boutwell that problems with TDS's infrastructure have prevented TDS from providing the promised "high speed" service.

108.  Defendants have completely failed to provide Mr. Boutwell with high-speed internet services.

## The TDS Defendants' roles

109. Upon enrolling in TDS's "High Speed Turbo" plan, Ms. Carroll received correspondence from "TDS" based out of "525 Junction Road, Madison, WI 53717."

110. According to TDS's representatives, TDS Delaware is the parent corporation of TDS Iowa.

111. TDS Iowa provides administrative and support services to operating companies owned by TDS Delaware.

112. TDS Iowa employs individuals who receive orders from customers, such as Ms. Carroll, when they order new services or make changes to their services.

113. Most importantly, TDS Iowa hosts the internet site and publishes the false and misleading advertisements that are at issue in this case.

114. TDS owns the internet site on which the "High-Speed Internet Plans" are falsely and misleadingly advertised.

115. TDS also owns the trademark "TDS" that is used in connection with the false and misleading advertisements.

116. Upon information and belief, TDS Delaware, TDS Iowa, and TDS have been involved in the drafting, formation, publishing, and all other aspects of the false and misleading advertisements related to the "High Speed Turbo" plan and have conducted their actions from 525 Junction Road, Madison, Wisconsin.

117. Additionally, some representations by TDS representatives have indicated that the infrastructure problem that has affected the service to rural Tennesseans is located outside of Tennessee and outside of the infrastructure operated by Tennessee Telephone Company.

118.     Also, all Defendants have been involved in the civil conspiracy to falsely, fraudulently, and misleadingly advertise TDS's "High-Speed Internet Plans."

<u>Class Action Allegations</u>

119.     Ms. Carroll brings this action as a Class Action pursuant to Federal Rule of Civil Procedure 23 and specifically Rule 23(b)(2) and Rule 23(b)(3).

120.     The Class is defined as follows:

Plaintiffs and all similarly situated persons and entities residing in Tennessee who subscribed to TDS's "High-Speed Internet Plans" and who did not actually receive "high speed" internet services.

121.     Additionally, the Class will include the following Subclass:

Plaintiffs and all similarly situated persons and entities who are part of the Class and were also charged an early termination fee.

122.     Excluded from the Class and Subclass are the named Defendants, their agents, affiliates, and employees, the Judge assigned to this matter and any member of the Judge's staff and immediate family.

123.     **Numerosity.**  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable.  Upon information and belief, the Class Members number in the thousands.  This Class, as defined above, meets the numerosity requirement.

124.     **Commonality.**  The claims of the Class Members raise numerous common issues of fact or law, thereby satisfying the requirements of Rule 23(a)(2).  These common legal and factual questions may be determined without the necessity of resolving individualized factual disputes concerning any Class Member and include, but are not limited to, the following questions:

**Questions of Fact**

(i)     Whether TDS actually provided the "high-speed" internet services as advertised;

(ii)     Whether infrastructure and other issues prohibited TDS from being able to provide the "high-speed" internet services advertised;

(iii)    Whether TDS had knowledge of the infrastructure and other issues that prohibited TDS from being able to provide the "high-speed" internet services;

(iv)    Whether TDS fraudulently, misleadingly, and falsely advertised the "high-speed" internet services while having knowledge that it could not provide such services.

**<u>Questions of Law</u>**

(i)     Whether TDS breached its contracts with customers by failing to provide the "high-speed" internet services that were advertised;

(ii)    Whether TDS was unjustly enriched when it received payments from customers for "high-speed" internet services that TDS never actually delivered;

(iii)   Whether TDS fraudulently advertised its "high-speed" internet services with knowledge that it could not provide such services;

(iv)    Whether TDS violated the Wisconsin Deceptive Trade Practices Act, WISC. STAT. § 100.18;

(v)     Whether TDS wrongfully charged early termination fees; and

(vi)    Whether the TDS Defendants were involved in a civil conspiracy in committing any of the aforementioned torts.

125.    **<u>Typicality</u>**.  The claims of the named Plaintiffs are typical of the unnamed Class Members because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendants engaged, namely falsely

advertising and then charging for "High-Speed Internet Plans" that TDS could not provide and knew it could not provide as well as by wrongly charging early termination fees.

126. **Adequacy of Representation.** The requirements of Rule 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to prosecute their claims vigorously on behalf of the Class Members, and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and they have no conflict with any other member of the Class. Plaintiffs have retained competent counsel experienced in class action litigation, including consumer and financial services class actions, to represent them and the Class Members in this litigation.

127. **General Applicability.** All the requirements for Rule 23(b)(2) are satisfied because the common factual and legal issues identified above show that TDS has acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Specifically, TDS has falsely, fraudulently, and misleadingly advertised its "High-Speed Internet Plans"; wrongfully charged the Class for services that were never provided; and wrongfully charged an early termination fees. The declaratory and injunctive relief sought would prevent TDS from committing these and other wrongful acts.

128. **Predominance and Superiority.** All the requirements for Rule 23(c)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiffs and the Class Members have

suffered a common cause of injury, namely the Class Members' legal claims arise exclusively under Tennessee and/or Wisconsin law, and therefore contain the same standards of proof of liability. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote, and even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, it is desirable to concentrate litigation in this forum. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class is proper.

## V. Causes of Action

### Count 1 – Breach of Contract

129. Plaintiffs incorporate by reference all prior and subsequent allegations contained in this Complaint as if fully set forth in this Count.

130. The Parties entered into a contract whereby Defendants would provide "high speed" internet in exchange for a monthly fee paid by Ms. Carroll and the individual class members.

131. TDS has advertised several "High-Speed Internet Plans" that claim to have a certain "range" of "high speed" internet access: the "Mach Internet" with "Download Range: 18Mbps [Megabits per second] to 25Mbps"; "Turbo Internet" with "Download Range: 8Mbps to 15Mbps";

"Express Internet" with "Download Range: 56Kbps [Kilobits per second] to 5Mbps"; and "Lite Internet" with "Download Range: 56Kbps to 1Mbps."

132.    TDS's "High-Speed Internet Plans" did not provide internet speeds within the advertised ranges, i.e., TDS did not meet the minimum speeds of each range.

133.    Additionally, TDS has advertised that the "High-Speed Internet Plans" could be used for certain activities, including, but not limited to, "[f]aster uploads and downloads" and being "[g]reat for visiting sites like Netflix, YouTube, and Hulu" and a "[s]uperior connection lets you stream Netflix Super HD."

134.    In fact, TDS's "High-Speed Internet Plans" could not be used for the advertised purposes.

135.    TDS's "High-Speed Internet Plans" were not "high speed" under any reasonable definition of the phrase "high speed," including the definition set by the FCC.

136.    Defendants have breached the Parties' contract by failing to provide the "high speed" internet speeds that Defendants have advertised and for which the Plaintiffs had contracted and paid.

137.    The TDS Defendants are incapable of, and know they are incapable of, providing the internet services for which Plaintiffs and the Class contracted because of infrastructure problems and other issues.

138.    Additionally, TDS wrongfully assessed early termination fees against Ms. Carroll and the Subclass given that TDS had breached the Parties' agreement beforehand by failing to provide the advertised and agreed to "High-Speed Internet" services.

139.    As a result of Defendants' breach, Plaintiffs and the Class have sustained damages including, but not limited to, modem and equipment charges, set up fees and charges, monthly

charges, costs associated with terminating Defendants' Internet service for another Internet Service Provider (including the difficulties associated with switching Internet Service Providers), and early termination fees.

<u>Count 2 – Violations of the Wisconsin Deceptive Trade Practices Act</u>

140.    Plaintiffs incorporate by reference all prior and subsequent allegations contained in this Complaint as if fully set forth in this Count.

141.    Defendants' actions constitute a deceptive trade practice in violation of the Wisconsin Deceptive Trade Practices Act, WISC. STAT. § 100.18.

142.    TDS or its agents or employees intended to sell, distribute, or increase consumption of TDS's service of providing purportedly "High Speed Internet" to rural Tennesseans.

143.    TDS or its agents or employees offered the purportedly "High-Speed Internet" service and equipment to the public through its internet and other marketing channels.

144.    TDS or its agents or employees intended to induce the public to enter into a contract or obligation relating to the purportedly "High-Speed Internet" services and equipment.

145.    TDS or its agents or employees advertised in both Tennessee and Wisconsin these "High-Speed Internet" services and equipment, and the advertisements contained announcements, statements, representations, or statements of fact that were and are untrue, deceptive, or misleading.

146.    Upon information and belief, TDS's false advertisements originated in Wisconsin and were also published over the internet in both Wisconsin and Tennessee.

147.    TDS's wrongful actions include, but are not limited to, substituting services of inferior value or quality for the services advertised and that Plaintiffs and the Class had purchased.

148.    TDS's deceptive trade practices have caused Plaintiffs and the Class pecuniary damages, including, but not limited to, modem and equipment charges, set up fees and charges, monthly charges, costs associated with terminating Defendants' Internet service for another Internet Service Provider (including the difficulties associated with switching Internet Service Providers), and early termination fees.

149.    Defendants are also liable to Plaintiffs and the Class for reasonable attorneys' fees and costs.

<u>Count 3 – Fraud</u>

150.    Plaintiffs incorporate by reference all prior and subsequent allegations contained in this Complaint as if fully set forth in this Count.

151.    Defendants fraudulently induced Ms. Carroll and the Class to subscribe to TDS's purportedly "High-Speed Internet Plans."

152.    Defendants made material misrepresentations, including, but not limited to, statements that the purportedly "High-Speed Internet Plans" would provide a certain range of internet speeds, but the service failed to meet even the minimum speed of each advertised range.

153.    Additionally, TDS advertised that the purportedly "High-Speed Internet Plans" provided a certain quality of service, including, but not limited to, "[f]aster uploads and downloads" and internet service "[g]reat for visiting sites like Netflix, YouTube, and Hulu" and a "[s]uperior connection lets you stream Netflix Super HD."

154.    However, the actual internet services provided by TDS were not of the quality advertised.

155.    Defendants' representations were false, were made with knowledge that the statements were false, and made with intent to deceive Plaintiffs and the Class.

156. Specifically, Defendants knew their infrastructure and other problems prohibited TDS from being able to provide "High-Speed Internet Plans" to Plaintiffs and the Class.

157. Plaintiffs and the Class signed up for Defendants' internet service in reliance on Defendants' fraudulent representations that Defendants would provide faster internet access.

158. As a result of Defendants' fraud, Plaintiffs and the Class have sustained damages including, but not limited to, modem and equipment charges, set up fees and charges, monthly charges, costs associated with terminating Defendants' Internet service for another Internet Service Provider (including the difficulties associated with switching Internet Service Providers), and early termination fees.

<u>Count 4 – Unjust Enrichment</u>

159. Plaintiffs incorporate by reference all prior and subsequent allegations contained in this Complaint as if fully set forth in this Count.

160. Defendants promised certain internet services that Defendants have failed to deliver.

161. Plaintiffs and the Class have provided consideration for services that they have not received.

162. As a result, Defendants have been unjustly enriched by receiving a benefit from Plaintiffs and the Class in the amounts paid for services, fees, and equipment, including, but not limited to, modem and equipment charges, set up fees and charges, monthly charges, costs associated with terminating Defendants' Internet service for another Internet Service Provider (including the difficulties associated with switching Internet Service Providers), and early termination fees.

163.     It is inequitable to allow Defendants to retain the benefit of the payments made by Plaintiffs and the Class given Defendants' failure to comply with the terms of the contract.

## Count 5 – Civil Conspiracy

164.     Plaintiffs incorporate by reference all prior and subsequent allegations as if fully set forth within this Count.

165.     The TDS Defendants had a common design to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means.

166.     Defendants committed overt acts in furtherance of the conspiracy, including, but not limited to, falsely advertising "High-Speed Internet Plans," charging customers for purportedly "High-Speed Internet Plans," covering up known infrastructure and other problems, and other wrongful acts to be proven at trial.

167.     Because of Defendants' actions, Plaintiffs and the Class have sustained damages including, but not limited to, modem and equipment charges, set up fees and charges, monthly charges, costs associated with terminating Defendants' Internet service for another Internet Service Provider (including the difficulties associated with switching Internet Service Providers), and early termination fees.

## Count 6 – Injunctive Relief

168.     Plaintiffs incorporate by reference all prior and subsequent allegations as if fully set forth within this Count.

169.     The Wisconsin Deceptive Trade Practices Act, WISC. STAT. § 100.18., empowers this Court to issue orders and injunctions to restrain and prevent violations of the WTPA.

170.     Additionally, Defendants may be enjoined from causing injury to Plaintiffs, violating Plaintiffs' rights, and causing irreparable harm to Plaintiffs and the Class.

171. Defendants are violating Plaintiffs' rights, and unless Defendants are temporarily, preliminarily, and permanently enjoined from engaging in the above-described misconduct, Plaintiffs will suffer immediate and irreparable injury by Defendants' wrongful actions.

172. Injunctive relief is appropriate in these circumstances because Plaintiffs and the Class will most likely prevail on the merits of its claim and the balancing of the equities favors Defendant.

<u>Count 6 – Punitive Damages</u>

173. Plaintiffs incorporate by reference all prior and subsequent allegations as if fully set forth within this Count.

174. Defendants' aforementioned actions were malicious, intentional, fraudulent, and reckless, as well as in intentional disregard for Plaintiffs' and the Class's rights

175. As a result, Plaintiffs and the Class are entitled to punitive damages in an amount not to exceed the constitutional limits.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray for the following relief from the Court:

a. Issue service of process and serve each Defendant;

b. Issue an order certifying that this action may be maintained as a class action, appoint Plaintiffs and their counsel to represent the Class and Subclass, and directing that reasonable notice of this action be given by Defendants to all Class Members;

c. Grant any reasonable request to amend the class action complaint to conform to the discovery and evidence obtained in this Class Action;

d.  Issue an order that grants a temporary injunction against Defendants under Federal Rule of Civil Procedure 65 and the WCPA from engaging in the aforementioned contractual breaches and unfair or deceptive acts or practices;

e.  Issue an order that grants a permanent injunction against Defendant from engaging in the aforementioned contractual breaches and unfair or deceptive acts or practices;

f.  Conduct a jury trial of all claims in this matter;

g.  Award Plaintiffs, the Class, and Subclass compensatory damages, punitive damages, or treble damages in an amount to be proven at trial;

h.  Award all expenses, costs, and attorneys' fees;

i.  Award pre-judgment and post-judgment interest at the maximum rate allowable by law; and

j.  Grant such other relief as may be appropriate.

THIS IS AN AMENDMENT TO PLAINTIFFS' FIRST APPLICATION FOR EXTRAORDINARY RELIEF IN THIS MATTER.

Respectfully submitted,


/s/Malcolm B. Futhey III
Malcolm B. Futhey III (TN 024432)
Futhey Law Firm PLC
1440 Poplar Avenue
Memphis, Tennessee 38104
901-725-7525
901-726-3506 (facsimile)
malcolm@futheylawfirm.com

Robert Stevie Beal (TN 007297)
Lena Beal-Cavness (TN 030068)
Beal Law Office
22 Monroe Avenue
Lexington, Tennessee 38351
731-968-9077
731-968-0782 (facsimile)
beallawoffice@gmail.com

William B. Ryan (TN 20269)
Donati Law Firm
1545 Union Avenue
Memphis, Tennessee 38104
901-278-1004
901-278-3111 (facsimile)
billy@donatilaw.com

*Counsel for Plaintiffs*

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing has been served this 20th day of June 2018 via CM/ECF on the following:

Eric S. Mattson, Esq.
Lisa E. Schwartz, Esq.
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
emattson@sidley.com
lschwartz@sidley.com

R. Dale Grimes, Esq.
Virginia Yetter, Esq.
Bass Berry and Sims PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
dgrimes@bassberry.com
vyetter@bassberry.com

*Counsel for Defendants*

/s/Malcolm B. Futhey III